U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2012 SEP 10 PM 4: 51

CLERK
BY_____PM_____
DEPUTY CLERK

FATA SAKOC,                          )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )     Case No. 5:11-cv-290
                                     )
TIMOTHY CARLSON,                     )
                                     )
        Defendant.                   )

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT
(Doc. 5)

Plaintiff Fata Sakoc brings this civil rights action under 42 U.S.C. § 1983 against

Trooper Timothy Carlson of the Vermont State Police ("VSP"). Plaintiff alleges that

Trooper Carlson violated her Fourth Amendment right to be free from unreasonable

searches and seizures during and after a March 5, 2010 motor vehicle stop that

culminated in her arrest and processing at the VSP barracks.

Presently before the court is Trooper Carlson's motion for summary judgment on

all claims. (Doc. 5.)[1] Plaintiff opposes the motion. On April 9, 2012, the court heard

oral argument. With the parties' consent, the court reviewed the police cruiser videotape

of the stop. On June 21, 2012, at the court's request, the parties filed a stipulated

transcript of the audio recording of the motor vehicle stop which begins approximately

eleven minutes after the commencement of the video recording.

---

[1] Trooper Carlson concedes that his motion for summary judgment was filed prior to any
discovery in this matter but contends that "this motion for summary judgment raising qualified
immunity is not premature, despite the absence of discovery." (Doc. 5 at 2.) The court agrees
that the motion is not premature, but notes that discovery may resolve some of the presently
disputed facts.

Plaintiff is represented by Brooks G. McArthur, Esq. and David J. Williams, Esq. Trooper Carlson is represented by Assistant Vermont Attorney General David Cassety.

## I.    Undisputed Facts.

On March 5, 2010, Plaintiff was driving home after completing a shift at The Converse Home, a Level III residential care facility in Burlington, Vermont. At approximately 11:17 p.m., Trooper Carlson spotted Plaintiff's vehicle traveling on Route 15 in Essex, Vermont with a headlight out. Trooper Carlson initiated a traffic stop by pulling behind Plaintiff's vehicle and activating his cruiser lights. The video depicts Plaintiff's vehicle using a directional to pull over to edge of the roadside with no apparent delay. There were no other vehicles close to Plaintiff's vehicle at this point and Trooper Carlson's cruiser pulled up behind her without any difficulty. The passing traffic was light in both directions and separated by what appears to be a highway median.

Trooper Carlson approached Plaintiff's vehicle and began questioning her. In doing so, he perceived her responses to be delayed, and he had to repeat several questions to obtain responses. In addition, Plaintiff was unable to produce a valid license or registration, although she produced two expired licenses. Trooper Carlson subsequently confirmed that Plaintiff had both a valid license and current registration.

Trooper Carlson asked Plaintiff to exit her vehicle, and she did so. He then asked her twice to shut the vehicle's door before he shut it for her.[2] Plaintiff was dressed in hospital scrubs and a winter coat. At Trooper Carlson's request, Plaintiff performed three field sobriety exercises. Officer Dunning of the Essex Police Department observed Plaintiff's performance from a distance of approximately ten feet. During the horizontal gaze nystagmus exercise, Trooper Carlson observed that Plaintiff showed lack of smooth pursuit and distinct jerkiness in each eye, for a score of four clues.

During the walk-and-turn exercise, Trooper Carlson noted that Plaintiff lost her balance while turning, twice started before being instructed to do so, failed to touch her heels to her toes, and took only eight of the nine requested steps, for a score of four clues.

---

[2] This interaction is not apparent from the video.

The video reveals that Plaintiff swayed slightly during her turn. The video also shows that Plaintiff started the exercise multiple times before it began; however, the audio is not available to determine whether this was contrary to instructions. It is also not clear from the video whether Plaintiff touched her heels to her toes. The video appears to depict Plaintiff taking the requisite nine steps in each direction. After the completion of this exercise, the audio recording commences.

Trooper Carlson next advised Plaintiff how to perform the one-leg stand and instructed Plaintiff to count up to thirty. In response, she counted in sequence from one to sixteen before Trooper Carlson told her she could put her foot down. Trooper Carlson determined that, during the one-leg stand, Plaintiff swayed while balancing and raised her arms for balance, for a total of two clues. The video illustrates that Plaintiff wobbled, but it is not clear from the video that she raised her arms more than six inches.[3] Trooper Carlson concluded that Plaintiff was "moderately impaired." The following exchange ensued:

> **Trooper Carlson:** All right, would you mind taking a preliminary breath test for me?
>
> **Plaintiff:** I don't really understand. I tell you I'm from work, I never take alcohol.
>
> **Trooper Carlson:** Okay, well, --
>
> **Plaintiff:** I never. I don't know what you smell, I never drink alcohol.
>
> **Trooper Carlson:** Okay.
>
> **Officer Dunning:** Okay, ma'am, if you haven't had any alcohol this evening, what you do is you blow into this for us, you blow zeros, and you'll be all set.
>
> **Plaintiff:** This is ridiculous, this is ridiculous. I say I never take alcohol, never drink alcohol.

---

[3] Raising arms more than six inches triggers the clue "uses arms to balance." (Doc. 6-1 at 3.)

**Officer Dunning:** Then you shouldn't be an issue when you take this test.

**Trooper Carlson:** Then it shouldn't be a problem. If you don't blow over .08, you're fine.

**Plaintiff:** This is ridiculous, I said. I have baby home. I drive back from –

**Trooper Carlson:** Okay, this will --

**Plaintiff:** -- it's my day first for work, I -- I lost my mother. And I said I never ever ever never take alcohol. This is --

**Trooper Carlson:** Okay.

**Plaintiff:** -- stupid.

**Trooper Carlson:** Ma'am, if you'd do this last thing for me; if you are okay, we'll let you go right now.

**Plaintiff:** Well, you can let me go right now because I said I never take alcohol, I never drink.

**Trooper Carlson:** Okay. Well, I can smell it, okay?

**Plaintiff:** What do you smell? I don't know what you smell. I said I don't have alcohol in me.

**Trooper Carlson:** Okay.

**Plaintiff:** What you going to do if I don't have alcohol in me?

**Officer Dunning:** Okay, ma'am, why don't you step back a little bit, okay . . . stop walking towards him. . . . Okay, why don't you stay right there.

**Plaintiff:** Yeah.

**Trooper Carlson:** Okay, will you just take the breath test? If you pass it, you'll be able to go home.

**Plaintiff:** If I don't have alcohol, what I am going to do for you?

**Trooper Carlson:** If you don't have alcohol, it's not a problem.

**Plaintiff:** It's not going to be problem, anyway, I said. How I said, I don't have alcohol -- if I don't have alcohol in me, what I can do for you? (inaudible) okay. Okay, where I'm going to go?

**Trooper Carlson:** Ma'am, I'm not going to let you leave.

**Plaintiff:** I'm not going to leave, I'm going to follow you there.

**Trooper Carlson:** No, you're not following me anywhere, I need you to take this test, first.

**Plaintiff:** Here?

**Trooper Carlson:** Right here.

(Tr. 3/5/10 at 3-6.) Thereafter, the officers administered a preliminary breath test to Plaintiff which revealed no alcohol in her system. Trooper Carlson told her: "All right, you're all set, okay?" (Tr. 3/5/10 at 6.) Plaintiff asked Trooper Carlson why he did not believe her and he told her that he smelled alcohol and that people lie to him. Plaintiff assured him that she would never lie. Trooper Carlson directed Plaintiff to get back into her car. He then engaged in a conversation with Officer Dunning. Although the transcript does not reflect this exchange, the audio recording reveals Trooper Carlson telling Officer Dunning that Plaintiff "got four on the eye test." Officer Dunning responded: "From where I was standing, she failed."

Trooper Carlson requested that a drug recognition expert ("DRE") be dispatched to the scene, noting that,"[s]he bombed that field sobriety[.]" (Tr. 3/5/10 at 10.) An unidentified officer informed Trooper Carlson that Officer Plunkett of the South Burlington Police Department, the DRE, was on his way. The unidentified officer asked Trooper Carlson: "Did she have any bad operation?" to which Trooper Carlson replied, "No, a headlight out." *Id.* The unidentified officer responded: "Okay. That might -- with drugs, normally we need some -- we need bad operation . . . either a crash, or

5

weaving, or whatever[.]" (Tr. 3/5/10 at 10-11.) The unidentified officer asked whether Plaintiff explained why she did so poorly on field sobriety exercises. Trooper Carlson responded: "No, I mean she just -- she doesn't understand a lot of English, it seems like, and she just (inaudible)." *Id.* He later described Plaintiff as "[m]ore or less [cooperative,] but I think there was kind of a language barrier, but I think she was just kind of playing dumb, too." (Tr. 3/5/10 at 21.)

Approximately six minutes later, Officer Plunkett arrived at the scene. Trooper Carlson described Plaintiff's performance on the field sobriety exercises, telling Officer Plunkett "I feel like she was pretty much intoxicated . . . but she blew zeros." (Tr. 3/5/10 at 16.) Officer Plunkett asked Trooper Carlson why he stopped Plaintiff to which Trooper Carlson responded: "Headlight out." *Id.* Thereafter, the following exchange took place:

> **Officer Plunkett:** Okay, did you see any other bad operation that would -- you know, like swerving or ---
>
> **Trooper Carlson:** When I first pulled up in front of her, she cut a car off like trying to get away from me, but (inaudible).
>
> **Officer Plunkett:** Okay. And so she cut a car off. She was driving straight, though, just kind of --
>
> **Trooper Carlson:** Yeah.
>
> **Officer Plunkett:** All right. I -- sounds like there's something there, but I can't do an eval with that just because I have to have some sort of unsafe operation, the standard they go by.
>
> **Trooper Carlson:** Okay.
>
> **Officer Plunkett:** You know, like say she was swerving, almost ran a red light, or something, or speeding, probably, you know, it'd be good to go, but this, you know, the defective equipment on the stop, my hands are tied there.
>
> **Trooper Carlson:** All right.
>
> **Officer Plunkett:** But if --- she cut a car off, you said, or --

6

**Trooper Carlson:** Yeah, I mean there was four of us going along, and she was in the left lane, and there was a car in the right lane, and she pulled right in between the two of them, and I pulled up behind her.

**Officer Plunkett:** Okay.

**Trooper Carlson:** And then --

**Officer Plunkett:** Was it like it was a pretty close move, or I mean was it --

**Trooper Carlson:** It was pretty close—

[fragments of statements with the remainder inaudible]

**Officer Plunkett:** It was an unsafe lane change, though?

**Trooper Carlson:** Yeah, I would call it that.

**Officer Plunkett:** But she like followed -- when she moved in, was she following the car in front of her too close.

**Trooper Carlson:** Yeah, I mean she was too close, and then she went right in between -- I couldn't even fit in between them right after she was . . . I had to wait until they slowed down along the edge.

**Officer Plunkett:** Okay. I mean if you can articulate the fact that what she did, as far as the lane change, and articulate the fact that it was unsafe, you know --

**Trooper Carlson:** Yeah, I can --

**Officer Plunkett:** -- a motor vehicle violation, and that her action was just so completely, you know, heinous that you had to stop her, and it drew your attention to her, and it was just unsafe, in general, --

**Trooper Carlson:** Right.

**Officer Plunkett:** -- then I think you can probably do something with it.

**Trooper Carlson:** Okay.

**Officer Plunkett:** And I guess in addition to the defective headlight, but like I said, my standard I have to go with is unsafe operation.

**Trooper Carlson:** Okay.

**Officer Plunkett:** So, you know, but I can't tell you to arrest her, it'd have to be under your own observations . . . you know, that you feel like she's impaired ... you know, shouldn't be driving, then I can -- I can do with it from there, . . . so if it's your opinion that she's unsafe, and she's impaired, and she's driving unsafely, you know, arrest her, and I'll do an eval on her if that's what you want to do[.]

(Tr. 3/5/20 at 16-20.)

At this point in the stop, Trooper Carlson again mentioned that Plaintiff "bombed" the field sobriety exercises. When asked if she was taking any medications, Trooper Carlson responded that she had said she was coming from her work at a nursing home to which one of the officers responded: "Plenty of drugs there." (Tr. 3/5/10 at 20.) Officer Plunkett advised: "I mean if you're happy going -- going with an arrest and what she did was unsafe, do it[,]" to which Trooper Carlson responded "All right." (Tr. 3/5/10 at 21.) Officer Plunkett advised Trooper Carlson that he needed to "run to [his] office and get [his] stuff" (Tr. 3/5/10 at 21) and would meet him at the VSP barracks. Officer Plunkett did not observe Plaintiff, question her, or perform any form of roadside evaluation.

Trooper Carlson approached Plaintiff's vehicle and asked her to turn it off and step out of it. She followed these instructions without apparent difficulty. He asked her four times if she was on any medications, and Officer Dunning asked her twice if she was prescribed any medications. Each time she responded that she was not. For the first time, Trooper Carlson told her "you didn't do well on the tests, the exercises, you didn't do well at all." (Tr. 3/5/10 at 23.) Plaintiff responded: "I told you I'm cool, I just lost mother maybe [twenty-five] days ago." *Id.* After Plaintiff again denied drinking or taking any drugs, Trooper Carlson advised her that he was placing her under arrest for

DUI. Plaintiff asked whether Trooper Carlson thought she had alcohol in her to which he responded in the affirmative. Officer Dunning corrected him, saying "No, we think you have something else in you, drugs[.]" (Tr. 3/5/10 at 25.) Plaintiff asked to call her husband and was told she could do that when she arrived at the police barracks. The officers told her they would retrieve her purse for her because her car would be towed to which Plaintiff responded: "unbelievable." (Tr. 3/5/10 at 26.) Plaintiff was patted down, placed in a cruiser, and transported to VSP's barracks in Williston, Vermont where Officer Plunkett evaluated her for drugs. After Officer Plunkett concluded that Plaintiff was under the influence of a depressant drug, Trooper Carlson transported Plaintiff to a hospital to obtain a sample of her blood. Plaintiff's blood test results revealed that Plaintiff had not consumed any prescription or illegal drugs. Plaintiff was released at approximately 3:30 a.m. on the following day.

## II.    Disputed Facts.

The parties dispute whether Trooper Carlson actually observed Plaintiff drive unsafely by cutting in front of another motorist or following too close. Plaintiff contends Trooper Carlson fabricated this claim in order to convince Officer Plunkett to perform the drug evaluation, or because Trooper Carlson believed he needed unsafe operation to establish probable cause for her arrest. The video does not depict the allegedly unsafe operation and there is no evidence that Trooper Carlson confronted Plaintiff with it at any time during the stop. In addition, he twice told other officers that the basis for the stop was a defective headlight.

Trooper Carlson contends that Plaintiff had slurred speech when responding to questions. Plaintiff's speech is accented but does not appear to be slurred on the audio recording. In addition, Trooper Carlson did not report slurred speech in describing Plaintiff's alleged signs of impairment to Officer Plunkett.

Trooper Carlson advised Plaintiff that he smelled alcohol when explaining why he wanted her to take a preliminary breath test. Plaintiff insisted multiple times that she was not drinking alcohol. Plaintiff contends that the results of the preliminary breath test,

9

indicating no alcohol consumption, create a reasonable inference that Trooper Carlson did not smell intoxicants and was fabricating this evidence.

Trooper Carlson contends that Plaintiff met the "decision point" on each of the field sobriety exercises. Trooper Carlson found four clues on the nystagmus test; however, there is no evidence that he was qualified to render this opinion.[4] Whether the "decision point" was met for the walk-and-turn test depends on Trooper Carlson's instructions to Plaintiff, which are not available on the audio recording. As for the one-leg stand test, Trooper Carlson stopped the test halfway through it and the video depicts Plaintiff wobbling slightly but does not clearly confirm whether Plaintiff met the "decision point."

Finally, Trooper Carlson twice described Plaintiff as "bombing" the field sobriety tests. Plaintiff disputes the accuracy of this characterization and the video does not unequivocally confirm it. In addition, as Plaintiff points out, the law enforcement officers repeatedly advised Plaintiff that she could go home if she passed the preliminary breath test. Plaintiff contends this supports a reasonable inference that they did not in fact believe Plaintiff "bombed" the field sobriety exercises or that her performance on them indicated she was incapable of driving safely.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

---

[4] Vermont courts generally require expert testimony to admit the results of a horizontal gaze nystagmus exercise because the exercise "presents data about which the average lay person is unfamiliar," and therefore admission of the results are subject to the relevance and reliability requirements of Rule 702 of the Vermont Rules of Evidence. *See State v. Larabee*, 4 Vt.Tr.Ct.Rptr. 30 (1999). The courts have also found that proper foundation for admission of the results of a horizontal gaze nystagmus exercise "requires evidence that the officer conducting the HGN test has been trained and is qualified to administer and score the test and a showing that the test was properly performed." *State v. Dufour*, 1 Vt.Tr.Ct.Rptr 183 (1997). There is no evidence that either Trooper Carlson or Officer Dunning was qualified to administer and score the exercise.

law.  Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party.  *Scott v. Harris,* 550 U.S. 372, 378 (2007).  The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *see also FDIC v. Giammettei,* 34 F.3d 51, 54 (2d Cir. 1994).

To avoid summary judgment, the non-moving party must offer more than "mere speculation and conjecture[.]"  *Harlen Assocs. v. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir. 2001).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  In other words, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248.

In assessing whether there are triable issues of fact, the court may rely on facts as depicted in an unaltered video recording, even when such facts differ from those presented by a party.  *See Harris,* 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the recording so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion.").

## B. Plaintiff's Claims and Qualified Immunity.

As the basis for her § 1983 claims against Trooper Carlson, Plaintiff contends Trooper Carlson violated her Fourth Amendment rights under the color of state law by: (1) unlawfully detaining her beyond the time reasonably necessary to effectuate the purpose of the motor vehicle stop; (2) arresting her without probable cause to believe she was operating a motor vehicle under the influence of alcohol or drugs; (3) unlawfully obtaining a sample of her blood without probable cause; and (4) unlawfully detaining her for more than four hours without probable cause.

In moving for summary judgment on all counts, Trooper Carlson contends that he did not violate Plaintiff's Fourth Amendment rights. In the event a constitutional violation is found, he argues that it was objectively reasonable for him to believe his actions complied with the law, entitling him to qualified immunity.

The determination of whether an official is entitled to qualified immunity is generally a question of law to be determined by the court prior to trial. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Qualified immunity shields government officials, including law enforcement officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). Qualified immunity thus protects government officials from lawsuits over errors made while reasonably performing their duties, whether resulting from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)) (internal quotation marks omitted). The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As a result, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227.

"When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson*, 555 U.S. at 232). "If the facts . . . do not establish a violation of a constitutional right, 'there is no necessity for further inquiries concerning qualified immunity,' and the officer is entitled to summary judgment." *Gilles*

*v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)).

### C. Whether Plaintiff was Unreasonably Detained Roadside.

Plaintiff first alleges that Trooper Carlson violated her Fourth Amendment rights by detaining her for a period of time longer than was necessary to complete the traffic stop. Trooper Carlson contends that he detained Plaintiff for a reasonable period of time in order to issue a traffic ticket for defective equipment, during which time he discovered facts giving rise to a reasonable suspicion that Plaintiff was under the influence of alcohol or drugs.

Under *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny, an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). Determining the legality of a *Terry* stop is a two-step analysis. First, the court examines whether the stop was justified at its inception. *Terry*, 392 U.S. at 20. And second, the court determines whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* While there is no per se time limit on the duration of a permissible investigatory stop, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (finding that a thirty minute detention based on reasonable suspicion was not "*per se,* too long.").

In connection with a valid traffic stop, a police officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (citation and internal quotation marks omitted). While effectuating the original purpose of the stop, an officer may discover "an independent basis for investigation[,]" which may necessitate prolonging the stop to investigate such wrongdoing. *United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006); *see also United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir. 2006) ("[A] brief encounter between an officer and driver . . . might independently give rise to facts

13

creating reasonable suspicion of criminal activity, thus warranting further investigation."). To determine whether an officer had a reasonable suspicion to extend the scope of a traffic stop, courts look to the "totality of the circumstances[,]" *United States v. Arvizu*, 534 U.S. 266, 273 (2002), considered "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (quoting *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977)) (internal quotation marks omitted).

The undisputed facts that materialized in the time that Trooper Carlson reasonably needed to issue Plaintiff a traffic citation for a defective headlight include: (1) Plaintiff's responses to questions were delayed and evidenced some confusion; (2) Trooper Carlson needed to repeat questions and instructions to Plaintiff; (3) Plaintiff could not immediately provide a valid license and registration; and (4) the stop occurred late at night when alcohol and drug consumption are arguably more common. These facts provided *some* evidence that Plaintiff might be impaired and created more than an "'inchoate and unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27) (explaining that reasonable suspicion is less than probable cause, but still requires "at least a minimal level of objective justification[.]"). Based upon his reasonable suspicion that Plaintiff might be impaired, Trooper Carlson asked Plaintiff to exit her vehicle, perform field sobriety exercises, and submit to a preliminary breath test. This was a permissible means of confirming or dispelling his reasonable suspicion and constituted a further reasonable detention. *See Royer*, 460 U.S. at 500 (holding "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.").

When it became apparent that Plaintiff was not under the influence of alcohol, after briefly consulting with Officer Dunning, Trooper Carlson decided to call a DRE to evaluate her further. When the DRE arrived, he refused to perform the evaluation

without evidence of unsafe operation and also appeared to be unprepared to perform it roadside as he need to "run to [his] office and get [his] stuff[.]" (Tr. 3/5/10 at 21.)

Considering the totality of the circumstances surrounding the traffic stop in the light most favorable to Plaintiff, there is no question that the initial traffic stop was proper. Thereafter, the facts and circumstances gave rise to a reasonable suspicion that Plaintiff was impaired, which Trooper Carlson was entitled to investigate further. The nature and duration of the detention, lasting approximately thirty-five minutes, during much of which Plaintiff was sitting unaccompanied in her vehicle, were also objectively reasonable. *See Tehrani*, 49 F.3d at 61 ("We decline to hold that a thirty minute detention based on reasonable suspicion is, per se, too long."); *see also United States v. Davies*, 768 F.2d 893, 902 (7th Cir. 1985) (finding forty-five minute detention reasonable under *Terry* where suspect "was not moved from the apartment building nor in any other way seriously [restrained] in his movements."). Accordingly, based upon the undisputed facts, Plaintiff's initial roadside detention did not violate the Fourth Amendment. *See Terry*, 392 U.S. at 19-20.

Assuming arguendo that a constitutional violation could be found, as a matter of law, it was objectively reasonable for Trooper Carlson to believe that Plaintiff's confusion, hesitation, and deficiencies on field sobriety exercises were the result of impairment and to investigate that suspicion further. Qualified immunity thus shields Trooper Carlson from liability unless a reasonable officer viewing the same facts and circumstances would understand his or her actions were unlawful and officers of reasonable competence could not differ as to that conclusion. *See Coons v. Casabella*, 284 F.3d 437, 440-41 (2d Cir. 2002); *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Here, no such determination could be made. Summary judgment in Trooper Carlson's favor with respect to Plaintiff's claim that the duration of the traffic stop violated her Fourth Amendment rights is therefore GRANTED.

**D.      Whether Trooper Carlson had Probable Cause to Arrest Plaintiff.**

Plaintiff alleges her Fourth Amendment rights were violated when Trooper Carlson arrested her without probable cause. In response, Trooper Carlson again asserts

15

that he is entitled to qualified immunity, claiming that there was no constitutional violation because he had probable cause to arrest Plaintiff, and, even if he did not, it was objectively reasonable for him to believe the arrest was lawful.

"Whether [an] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it[.]" *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause exists "where 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). The totality of the circumstances must be "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

Trooper Carlson suspected that Plaintiff violated 23 V.S.A. § 1201(a)(3), which prohibits a person from operating a vehicle when under the influence of drugs "to a degree which renders the person incapable of driving safely[.]"[5] In asserting that there was probable cause to arrest Plaintiff for driving under the influence, Trooper Carlson relies on the same evidence that gave rise to the roadside detention coupled with his claim that Plaintiff operated her motor vehicle in an unsafe manner prior to the stop.

The Vermont Supreme Court has not decided what indicia of drug impairment gives rise to probable cause to arrest for a violation of 23 V.S.A. § 1201(a)(3). Case law from other jurisdictions reveals that the courts have focused on typical signs of driver impairment such as slurred speech, watery and bloodshot eyes, and instability. *See, e.g., Wilson v. Dir. of Revenue*, 35 S.W.3d 923, 926 (Mo. Ct. App. 2001) (finding probable cause to arrest suspect, even after he passed breath analyzer, who was lethargic, had

---

[5] "A person shall not operate, attempt to operate, or be in actual physical control of any vehicle on a highway . . . when the person is under the influence of any other drug or under the combined influence of alcohol and any other drug to a degree which renders the person incapable of driving safely[.]" 23 V.S.A. § 1201(a)(3).

watery and bloodshot eyes, was wobbly and had difficulty following instructions, and performed very poorly on two of three field sobriety exercises); *People v. Candelaria*, 96 Cal.Rptr. 90, 92 (Cal. Ct. App. 1971) (finding probable cause to arrest where suspect's eyes were pinpointed and did not react to light, his motor movements were slow, and his speech was slurred); *Castaneda v. State*, 664 S.E.2d 803, 807 (Ga. Ct. App. 2008) (finding probable cause to arrest suspect for driving under the influence of inhalants noting suspect's "driving, coupled with his physical condition at the scene, including stumbling, slurred speech, confusion, and difficulty balancing[.]"); *State v. Maze*, 124 P.3d 1083, at *3 (Kan. Ct. App. 2005) (table) (finding probable cause to arrest for driving under the influence of drugs based on suspect's driving "as well as his jittery body movements, the suspicious condition of his eyes, his slurred speech, his difficulty in signing the correct name and inability to recite the correct birth date, his failure of two sobriety tests, and the absence of an alcohol odor.").

Probable cause for driving under the influence of drugs has also been found when signs of impairment exist, but the possibility of alcohol impairment has been eliminated. *See State v. Berger*, 2004 ND 151, ¶ 19, 683 N.W.2d 897, 903 ("When a driver exhibits a significant level of impairment and alcohol usage has been tentatively eliminated as the cause of the impairment, it is reasonable to conclude the driver is under the influence of drugs or another substance."); *People v. Munsey*, 95 Cal. Rptr. 811, 815 (Cal. Ct. App. 1971) ("The probability that defendant's condition was produced by alcohol having been tentatively eliminated, it became reasonable to entertain and hold a strong suspicion that defendant was under the influence of a narcotic.").

Often erratic driving is cited as giving rise to probable cause to arrest as it evidences an inability to operate a motor vehicle safely. *See, e.g.*, *State v. Tellez*, 431 P.2d 691, 693, 697 (Ariz. Ct. App. 1967) (finding arrest lawful when driver swerved across the middle line, was incoherent and unsteady on his feet, driver's eyes reacted poorly to light, and driver had fresh puncture marks on his arm); *People v. Chacon*, 61 Cal.Rptr. 807, 809 (Cal. Ct. App. 1967) (finding probable cause to arrest when officers

observed erratic driving, driver was unsteady, his eyes were fixed and pinpointed, and his speech was slurred).

Here, Trooper Carlson points to a number of facts that support his arrest of Plaintiff including unsafe operation; however, many of those facts are either disputed or alleged to have been fabricated. Accordingly, the court limits its examination to the undisputed evidence and regards that evidence in the light most favorable to Plaintiff. *See Harris*, 550 U.S. at 378.

By the time of Plaintiff's arrest, Trooper Carlson was fully aware that any difficulty she experienced in answering questions and responding to instructions was either attributable to a language barrier or to what he claimed was "playing dumb." When discussing the evidence with other officers, he no longer attributed any of her confusion or hesitation to impairment. The audio tape also reveals no evidence of slurred or delayed speech or mental confusion or impairment. To the contrary, Plaintiff directly and clearly responded to the officers' questions without apparent difficulty.

Plaintiff repeatedly told the officers that she had consumed no alcohol and a preliminary breath test revealed this claim was truthful. She was equally adamant that she had consumed no drugs. She was coming from work dressed in medical scrubs and returning home to her baby. There was thus nothing concerning about her route, manner, purpose, or time of travel. The video depiction of Plaintiff's operation reveals her responding in an appropriate fashion to activated cruiser lights by signaling and pulling over to the edge of the highway. There is no evidence of the four cars traveling together and the unsafe and too close lane change described by Trooper Carlson.

Plaintiff's performance on field sobriety exercises is more difficult to evaluate. The audio recording begins with the third and final exercise and the video recording offers only a hazy glimpse of what a trained law enforcement officer was witnessing first hand at close range. Examining Plaintiff's performance on the two field sobriety exercises for which Trooper Carlson was qualified to render an opinion, the evidence does not unequivocally support a conclusion that Plaintiff "failed" those exercises. With regard to the walk and turn, although it is clear that Plaintiff is not performing the

exercise as expected, the video recording reveals an ongoing, albeit inaudible, discussion between her and Trooper Carlson until she completes the exercise in what appears to be a satisfactory manner. A rational juror could conclude that any difficulties Plaintiff was experiencing in beginning the exercise were attributable to a language barrier as opposed to impairment.

With regard to the one leg stand, Plaintiff appears to be performing it successfully until Trooper Carlson tells her to put her foot down mid-exercise. Plaintiff does not appear unsteady on her feet and does not grasp objects or persons for support or balance. A rational juror could thus find that Trooper Carlson either exaggerated or fabricated evidence when he concluded that Plaintiff failed this exercise. As Plaintiff points out, if in fact she "bombed" the field sobriety exercises and was unsafe to drive, there would be no reason for the law enforcement officers to repeatedly assure her that she would be free to go if the preliminary breath test was less than .08.

Officer Plunkett, the DRE, arrived on the scene but did nothing to evaluate Plaintiff. No additional evidence was thus gleaned as a result of his presence. A rational juror, examining the exchange between Officer Plunkett and Trooper Carlson, could conclude that the former was coaching the latter as to what would be required for either a DRE evaluation or probable cause to arrest.

Examining the totality of the undisputed evidence in the light most favorable to Plaintiff, the court cannot find as a matter of law that Trooper Carlson possessed "'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Fabrikant v. French*, 2012 WL 3518527, at *15 (2d Cir. Aug. 16, 2012) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). At best, he had a reasonable suspicion that something other than alcohol was causing Plaintiff to perform field sobriety exercises less than perfectly. To determine whether, based upon his first hand observations, this other evidence gave rise to probable cause to arrest, a jury must first evaluate his credibility, weigh the evidence, and determine the underlying facts. *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("Credibility assessments, choices

19

between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.").

The court thus finds that disputed issues of fact preclude summary judgment in Trooper Carlson's favor regarding whether he violated Plaintiff's constitutional rights when he arrested her. Because the lawfulness of Plaintiff's arrest impacts the lawfulness of her detention at the VSP barracks and transport to the hospital to obtain a blood sample, the court precedes no further to address whether constitutional violations may be found on those additional grounds.

### E. Whether Qualified Immunity Remains Available.

Although there are disputed facts prohibiting a finding as a matter of law that Trooper Carlson had probable cause to arrest Plaintiff, Trooper Carlson is nonetheless entitled to summary judgment if Plaintiff's rights were not clearly established at the time of the violation. *See Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010).

To determine whether a right is clearly established, courts in the Second Circuit look to "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Fischer*, 616 F.3d at 105. While this inquiry is focused on the specific circumstances in a particular case, it does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," but rather "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

An officer is entitled to qualified immunity if he or she had "arguable probable cause," which is to say that "officers of reasonable competence could disagree on whether the probable cause test was met." *Coons*, 284 F.3d at 441 (quoting *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir. 1995)). This remains true even if the "facts supporting probable cause to arrest are ultimately found not to have existed[.]" *Finigan v. Marshall*, 574 F.3d 57, 61 (2d Cir. 2009).

The parties do not dispute that Plaintiff's right to be free from arrest without probable cause was clearly established. The court thus turns to whether Trooper Carlson's belief that he had probable cause to arrest was objectively reasonable. *See Coons*, 284 F.3d at 440-41 ("Because the right to be free of arrests made without probable cause was clearly established at the time . . . [this] turns on whether [the officer's] probable cause determination was objectively reasonable.") (citation omitted); *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) ("In determining whether an officer is entitled to qualified immunity for a false arrest claim in the absence of probable cause, we examine whether there was 'arguable probable cause.'") (quoting *Walczyk*, 496 F.3d at 163). In determining whether there was arguable probable cause, the court does "'not consider the subjective intent, motives, or beliefs' of the officer." *Amore*, 624 F.3d at 536 (quoting *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 106 (2d Cir. 2003)).

The reasonableness of Trooper Carlson's determination that his arrest was lawful turns on the credibility of his alleged observations. If Trooper Carlson witnessed unsafe operation and then witnessed Plaintiff score the requisite clues for an officer decision point on all three field sobriety exercises, it was objectively reasonable for him to believe that his arrest of Plaintiff was supported by probable cause because his judgment was not "so flawed that no reasonable officer would have made a similar choice." *Amore*, 624 F.3d at 531 (citation omitted).

Conversely, if Trooper Carlson fabricated the evidence of unsafe operation or exaggerated the deficiencies in Plaintiff's performance on field sobriety exercises, reasonable law enforcement officers could not differ in rejecting such evidence to support probable cause. *See Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) ("On the present record, Almenas cannot establish his entitlement to qualified immunity as a matter of law. Scotto alleges that Almenas fabricated a parole violation and arrested him knowing he lacked probable cause to do so. Such conduct, if proved, would plainly violate Scotto's clearly established right to be free from arrest in the absence of probable cause."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (reversing grant of summary judgment because "plaintiffs' evidence could support view" that

defendants cooperated in an unlawful arrest and then "falsif[ied] the circumstances, although they knew there was no probable cause to justify the arrest."); *Golino v. City of New Haven*, 950 F.2d 864, 871-72 (2d Cir. 1991) (holding summary judgment is unavailable where a jury must decide whether officers who intentionally omitted exculpatory information from affidavit could reasonably rely on that warrant issued in reliance upon that affidavit when arresting suspect).

In this case, because there are material facts in dispute, "it is impossible to determine" whether it was objectively reasonable for Trooper Carlson to believe that he had probable cause to arrest Plaintiff. *See Scotto*, 143 F.3d at 113. Qualified immunity thus is unavailable at this stage in the proceedings. *See Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (citation omitted); *see also Taravella*, 599 F.3d at 135 ("Although a conclusion that . . . conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material . . . facts, if there is such a dispute, the factual question must be resolved by the factfinder.") (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (internal quotation marks omitted). The court therefore DENIES Trooper Carlson's motion for summary judgment on all of Plaintiff's remaining claims.

## CONCLUSION

For the reasons set forth above, Trooper Carlson's motion for summary judgment (Doc. 5) is GRANTED IN PART AND DENIED IN PART.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this /0ᵗʰ day of September, 2012.

Christina Reiss, Chief Judge
United States District Court