UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2015 MAY -8  PM 4: 19**

CLERK

BY_____
DEPUTY CLERK

FATA SAKOC,                              )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )     Case No. 5:11-cv-290
                                        )
TIMOTHY CARLSON,                        )
                                        )
          Defendant.                    )

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT
(Doc. 95)

Plaintiff Fata Sakoc brings this action under 42 U.S.C. § 1983 against Defendant Trooper Timothy Carlson ("Trooper Carlson") of the Vermont State Police ("VSP") for violating her Fourth Amendment right to be free from unreasonable seizures when he allegedly unlawfully arrested her for operating a motor vehicle while under the influence of a drug. Since filing her Complaint in this matter, Ms. Sakoc has confined her claim to her allegedly unlawful arrest and does not assert post-arrest claims.

Pending before the court is Trooper Carlson's motion for summary judgment (Doc. 95), in which he argues that he had probable cause to arrest Ms. Sakoc. In the alternative, Trooper Carlson argues that he is entitled to judgment as a matter of law in his favor because he had arguable probable cause and is therefore protected by qualified immunity. Ms. Sakoc counters that there are disputed material facts which preclude summary judgment and which must be resolved before probable cause or arguable probable cause can be determined.

On February 2, 2015, the court held oral argument on the pending motion. After the parties completed post-hearing briefing on February 17, 2015, the court took the motion under advisement.

Ms. Sakoc is represented by David J. Williams, Esq. and Brooks G. McArthur, Esq. Trooper Carlson is represented by Assistant Vermont Attorney General Kate T. Gallagher.

## I.     The Undisputed Facts.

### A.     The Traffic Stop and Its Aftermath.

On March 5, 2010, at approximately 11:15 p.m., Trooper Carlson stopped Ms. Sakoc in Essex Junction, Vermont for operating a motor vehicle with one headlight out. Trooper Carlson initiated the traffic stop by turning his cruiser around, pulling behind Ms. Sakoc's vehicle, and activating his cruiser's blue lights.[1] After Ms. Sakoc pulled over, Trooper Carlson approached her vehicle and asked her for her license and registration. Ms. Sakoc spoke with an accent but appeared to speak and understand English well. At the time of the stop, Ms. Sakoc was wearing a blue nursing uniform and was driving home after completing her shift at The Converse Home, a Level III residential care facility located in Burlington, Vermont. Trooper Carlson asked Ms. Sakoc to exit her vehicle to perform standardized field sobriety tests ("SFSTs"). At approximately this point, Officer Stephen Dunning, of the Essex Police Department, arrived on the scene to provide assistance.

This was Trooper Carlson's first investigation of a motorist for driving under the influence ("DUI"), and he was in the process of completing his field training under the supervision of Sergeant Michael Kamerling of the VSP. Both Trooper Carlson and Officer Dunning attended and graduated from the Vermont Police Academy in 2009 and were trained to administer and score SFSTs. Trooper Carlson attained a final class

---

[1] Commencing at approximately 23:17:41, a video recording from Trooper Carlson's cruiser camera captures some of the encounter. An accompanying audio recording commences at approximately 23:28:12. The "existence in the record of a videotape capturing the events in question" is sufficient to make the facts depicted undisputed, if the videotape has not been altered. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). "In assessing whether there are triable issues of fact, the court may rely on facts as depicted in an unaltered videotape and audio recording, even when such facts contradict those claimed by the nonmoving party." *MacLeod v. Town of Brattleboro*, 2012 WL 5949787, at *7 (D. Vt. Nov. 28, 2012), *aff'd*, 548 F. App'x 6 (2d Cir. 2013).

average of 97.44% in his basic training and 99% in his post-basic DUI Enforcement Training.

Trooper Carlson first asked Ms. Sakoc to perform the Horizontal Gaze Nystagmus ("HGN"). According to the Vermont Criminal Justice Training Council, HGN "refers to an involuntary jerking occurring as the eyes gaze toward the side. In addition to being involuntary the person experiencing the nystagmus is unaware that the jerking is happening." (Doc. 97-7 at 95.) "In administering the HGN test, the officer has the suspect follow the motion of a small stimulus with the eyes only. The stimulus may be the tip of a pen or penlight, an eraser on a pencil or your finger tip, whichever contrasts with the background." *Id.* There are six potential clues, three for each eye, that may be observed during a suspect's performance on the HGN, which include lack of smooth pursuit, jerkiness at maximum deviation, and jerkiness that begins "prior to a 45-degree angle[.]" *Id.* at 96. An officer must observe at least four clues to reach a decision point on the HGN.

When Ms. Sakoc performed the HGN, she was facing oncoming traffic and the blue strobe lights of Trooper Carlson's cruiser. Trooper Carlson administered the HGN by moving his finger from side to side past Ms. Sakoc's face and observing her eyes as they followed his finger. In a DUI affidavit which is unsigned,[2] Trooper Carlson recorded that he observed a lack of smooth pursuit and jerkiness in both of Ms. Sakoc's eyes, which he equated to a score of four clues on the HGN. (Doc. 96-1 at 4.)

Trooper Carlson next directed Ms. Sakoc to perform the Walk-and-Turn exercise (the "WAT"). The WAT "is a divided attention test consisting of two stages: Instructions Stage; and, Walking Stage." (Doc. 97-7 at 98.) "In the Instructions Stage, the subject must stand with their feet in heel-to-toe position, keep their arms at their sides, and listen to the instructions." *Id.* (emphasis omitted). "In the Walking Stage[,] the subject takes nine heel-to-toe steps, turn[s] in a prescribed manner, and take[s] nine heel-to-toe steps back, while counting the steps out loud, while watching their feet." *Id.* (emphasis

---

[2] Trooper Carlson has filed an affidavit in which he avers the contents of the DUI affidavit are true. *See* Doc. 96-1 at 2.

omitted). "The Walking Stage divides the subject's attention among a balancing task
(walking heel-to-toe and turning); a small muscle control task (counting out loud); and a
short-term memory task (recalling the number of steps and the turning instructions)." *Id.*
There are eight potential clues that may be observed during a subject's performance:
"can't balance during instructions; starts too soon; stops while walking; doesn't touch
heel-to-toe; steps off line; uses arms to balance; loses balance on turn or turns incorrectly;
and, takes the wrong number of steps." *Id.* An officer must observe at least two clues on
the WAT to reach a decision point.

　　During her performance of the WAT, Ms. Sakoc initially began walking toward
the cruiser until Trooper Carlson directed her to stop. Trooper Carlson then demonstrated
the WAT by taking steps touching his heels to his toes and then turning by taking
multiple small steps. Ms. Sakoc resumed the WAT as Trooper Carlson continued his
demonstration. Based on the video, it appears that Ms. Sakoc took the required nine steps
and it is not clear whether she lost her balance. The video does not clearly depict whether
she touched her heels to her toes. In his DUI affidavit, Trooper Carlson recorded that
Ms. Sakoc exhibited four clues based on his observations: she lost her balance while
turning; started before instructed; failed to touch her heels to her toes; and took an
incorrect number of steps.

　　Trooper Carlson then directed Ms. Sakoc to perform the One-Leg Stand (the
"OLS").

> The One-Leg Stand test . . . is a divided attention test consisting of two
> stages:
>
> - Instructions Stage; and,
> - Balance and Counting Stage.
>
> In the Instruction Stage, the subject must stand with feet together, keep
> arms at sides, and listen to instructions. This divides the subject's attention
> between a balancing task (maintaining a stance) and an information
> processing task (listening to and remembering instructions.)
>
> In the Balance and Counting Stage, the subject must raise one leg, either
> leg, with the foot approximately six inches off the ground, keeping raised

4

foot parallel to the ground. While looking at the elevated foot, count out loud in the following manner: "one thousand and one", ''one thousand and two", "one thousand and three" until told to stop. This divides the subject's attention between balancing (standing on one foot) and small muscle control (counting out loud).

*Id.* at 99 (emphasis omitted). There are four potential clues that may be observed during the OLS, which include: "sways while balancing; uses arms to balance; hops; puts foot down." *Id.* An officer must observe at least two clues on the OLS to reach a decision point.

In demonstrating the OLS, Trooper Carlson instructed Ms. Sakoc to "put your feet together, kind of like this, with your hands by your side[,]" (Doc. 21 at 2:9-2:10), and "point your toe about six inches off the ground, and it's look your toe, and you're going to count out loud to 30[.]" *Id.* at 2:13-2:16. Trooper Carlson twice told Ms. Sakoc "[y]ou may begin." *Id.* at 2:25. During the OLS, the video reveals that Ms. Sakoc momentarily swayed slightly and raised her hands from her side. Trooper Carlson told Ms. Sakoc to put her foot down after she counted to sixteen, instead of the instructed thirty. In his DUI affidavit, Trooper Carlson recorded that Ms. Sakoc swayed while balancing and used her arms to balance by raising her hand more than six inches, resulting in two clues.

Officer Dunning watched Trooper Carlson administer some of the SFSTs to Ms. Sakoc. He did not observe the results of the HGN and, at approximately 23:28:20, Officer Dunning turned his back on Ms. Sakoc during the WAT. At approximately 23:29:27, Officer Dunning briefly glanced away from Ms. Sakoc during the OLS. At approximately 23:33:26, Officer Dunning advised Trooper Carlson, "from where I was standing she failed."[3]  (Ex. 97-8 at 23:33:25.)

---

[3]  The transcript of the audio recording indicates that this exchange is inaudible, *see* Doc. 21 at 8:13-8:14, however it is undisputed that Officer Dunning stated "she failed." This is consistent with his narrative completed as part of a March 7, 2010 incident report wherein he states: "On 03-05-2010 at approximately 2325 hours I assisted Trooper Carlson with screening a possibly intoxicated driver on Pearl Street. Driver blew .000% BAC but failed other field sobriety tests[.]" (Doc. 96-5 at 4.) Although Plaintiff disputes the accuracy of Officer Dunning's

5

After the completion of SFSTs, Trooper Carlson concluded that Ms. Sakoc was moderately impaired and asked her to take a preliminary breath test. Trooper Carlson told Ms. Sakoc: "If you pass it, you'll be able to go home." (Doc. 21 at 5:8-5:9.) Officer Dunning similarly stated, "if you haven't had any alcohol this evening, what you do is you blow into this for us, you blow [zeroes], and you'll be all set." *Id.* at 3:16-3:19. Ms. Sakoc contested the necessity of the preliminary breath test, but she ultimately submitted to the test. Officer Dunning administered the preliminary breath test, which indicated that Ms. Sakoc had no alcohol in her system.

Trooper Carlson ordered Ms. Sakoc to return to her vehicle, and Trooper Carlson and Officer Dunning discussed what to do after Ms. Sakoc's purported poor performance on SFSTs and her negative result on the preliminary breath test. Trooper Carlson decided to request that his dispatcher locate a drug recognition expert (a "DRE") to evaluate whether Ms. Sakoc might be impaired due to drugs. After making this contact with dispatch, Sergeant Michael Kamerling, Trooper Carlson's supervisor, responded and advised that Officer Matthew Plunkett, a DRE, would respond. Sergeant Kamerling then asked Trooper Carlson if Ms. Sakoc had "any bad operation?" *Id.* at 10:23. Trooper Carlson responded: "No, a headlight out." *Id.* at 10:24. Sergeant Kamerling informed Trooper Carlson "[t]hat . . . with drugs, normally we need some—we need bad operation, . . . either a crash, or weaving, or whatever[.]" *Id.* at 10:25-11:5.

At approximately 23:47:09, Officer Plunkett arrived on the scene. Trooper Carlson informed him that "I feel like she was pretty much intoxicated . . . but she blew [zeroes]." *Id.* at 16:18-16:21. Officer Plunkett asked why Trooper Carlson had stopped Ms. Sakoc, to which Trooper Carlson responded: "Headlight out." *Id.* at 16:24. Officer Plunkett asked whether Trooper Carlson observed any unsafe operation, and later noted that he could not do a DRE evaluation on the basis of a "defective equipment . . . stop[.]" *Id.* at 17:18-17:19. Trooper Carlson answered that Ms. Sakoc had "cut a car off like trying to get away from me[.]" *Id.* at 17:4-17:5. Officer Plunkett asked if "[it] was an

conclusion, she does not deny that, prior to her arrest, he conveyed this opinion to Trooper Carlson. *See* Doc. 98 at 13-14, ¶ 18.

6

unsafe lane change[?]" *Id.* at 18:13-18:14. Trooper Carlson stated: "Yeah, I would call it that." *Id.* at 18:15-18:16.[4] Officer Plunkett advised Trooper Carlson that "I can't tell you to arrest her, it'd have to be under your own observations[.]" *Id.* at 19:22-19:23. Trooper Carlson stated that he planned to arrest Ms. Sakoc, and Officer Plunkett agreed to conduct a DRE evaluation of Ms. Sakoc at the VSP Williston Barracks.

The officers transported Ms. Sakoc to the VSP Williston Barracks, where Officer Plunkett conducted a DRE evaluation, which includes the administration of certain SFSTs. Officer Plunkett determined that Ms. Sakoc was under the influence of a central nervous system depressant.

After the DRE evaluation, Ms. Sakoc agreed to provide a blood sample, and the officers transported her to a nearby hospital to obtain one. At 3:20 a.m. on March 6, 2010, Ms. Sakoc provided a blood sample that revealed the presence of caffeine, cotinine, nicotine, and theobromine. For purposes of summary judgment, Trooper Carlson concedes that these drugs would not impair Ms. Sakoc's ability to operate a motor vehicle. Ms. Sakoc was issued a citation but was not ultimately charged with operating a vehicle under the influence of intoxicating liquor or other substance in violation of 23 V.S.A. § 1201.

### B.   SFSTs.

The Vermont Police Academy teaches police officers how to administer and score SFSTs as part of its post-basic DUI Enforcement Training Curriculum. According to the DUI Detection and Standardized Field Sobriety Testing Student Manual (the "Manual") provided to Trooper Carlson during his training, SFSTs are "used by the officer to develop probable cause for arrest and as evidence in court." (Doc. 97-7 at 108.) The Manual further states that: "Laboratory research indicated that these three tests [i.e., the

---

[4] Because it is a contested issue of fact, Trooper Carlson concedes that the court cannot rely on evidence of Ms. Sakoc's alleged erratic operation to support a probable cause or arguable probable cause determination. Ms. Sakoc points out that Trooper Carlson did not advise her that erratic operation was the reason for the stop, but rather referenced only her inoperable headlight. She contends that evidence that Trooper Carlson allegedly fabricated a claim of erratic operation is admissible because it calls his credibility into question and, in turn, provides a basis to dispute his other observations during the traffic stop.

7

HGN, WAT, and OLS], when administered in a standardized manner, were a highly accurate and reliable battery of tests for distinguishing BACs [blood alcohol concentrations] above 0.10[.]" *Id.* The Manual does not address whether SFSTs are useful in evaluating impairment by drugs.

The National Highway Traffic Safety Administration of the U.S. Department of Transportation ("NHTSA") has concluded that SFSTs, as used by trained and experienced law enforcement officers roadside, are valid indicia of the presence of alcohol based upon three validation studies. Dr. Marcelline Burns, the author of three NHTSA validation studies, has observed that SFSTs have been assessed for accuracy only as they correlate to blood alcohol concentration, not driving performance.

## II.   Disputed Facts.

The parties dispute what transpired at the inception of the traffic stop. Trooper Carlson recorded the following in his DUI affidavit:

> While speaking with Sakoc she stopped, thought for a second and then proceeded to answer my questions. I had to repeat myself several times before she understood some questions. Her speech was slightly slurred. She handed me insurance, an invalid registration and two different licenses, both expired. I took the more recently expired license since she was unable to locate a valid one. DMV records show that she does have a valid license and the vehicle is currently registered. While speaking with Sakoc I thought I smelled a faint odor of intoxicants coming from her vehicle. Officer Dunning of the Essex Police Department arrived at this time.
>
> When I approached Sakoc after checking her DMV records I asked whether she had used any alcohol. She told me she hadn't used alcohol in a long time. She also told me her mother had just died seven or eight days prior. . . . Again I smelled a faint odor of intoxicants coming from her vehicle. I again asked her whether she used any alcohol and she told me she didn't ever use alcohol. I asked whether she would step from her vehicle as I wanted to put her through some exercises to make sure that she was ok to drive. She consented telling me she hadn't used anything. When she stepped from her vehicle I asked her to shut her door. I had to repeat myself twice before she did so.

(Doc. 96-1 at 8, ¶¶ 2-3.)

Ms. Sakoc cites her own testimony that she was not confused, her speech was not slurred, and her responses were not delayed at any time during the traffic stop.[5] She also cites her further testimony that Trooper Carlson did not need to repeat his questions or instructions to her, and that she produced a valid license and registration. She notes that while Officer Dunning agreed that Ms. Sakoc's speech was "confused," he attributed this to a "language barrier issue." (Doc. 97-9 at 34:7-34:8.)

Ms. Sakoc contends Trooper Carlson's observations during the traffic stop that he could smell an odor of intoxicants are additional evidence of his lack of credibility because this was not corroborated by Officer Dunning. She further notes that Trooper Carlson did not check the box for an odor of intoxicants on his DUI affidavit, and also did not check boxes indicating that she had trouble getting out of her vehicle, or difficulty in standing or walking. Although Trooper Carlson wrote on his DUI affidavit that Ms. Sakoc's attitude was "[u]ncooperative," (Doc. 96-1 at 7), Officer Dunning agreed that she responded "appropriately" to Trooper Carlson's questions and was "compliant." (Doc. 97-9 at 34:15.)

The parties dispute Ms. Sakoc's performance on SFSTs and whether she exhibited confusion and a failure to follow instructions. Trooper Carlson's DUI affidavit contains the following observations:

> During HGN Sakoc kept moving her head to follow the tip of my finger although I kept reminding her not to move her head. During the Walk and Turn she started the test twice before I told her to. She took only eight steps down. She missed heel to toe on the first step coming back. She lifted her arms for balance throughout the exercise. During the One Leg Stand she swayed while balancing and lifted her arms for balance. I asked her to provide a preliminary breath test. She told me why and asked why I was doing this to her since she told me she hadn't had anything to drink. I

---

[5] Ms. Sakoc filed a "Counter-Statement of Undisputed Material Facts" (Doc. 97-1) to further support her opposition to summary judgment. Under Local Rule 56(b), "[a] party opposing summary judgment . . . must provide a separate, concise statement of disputed material facts." "The rule thus does not authorize the filing of a statement of additional undisputed facts by the non-moving party." *Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 276 (D. Vt. 2013). However, the court may consider "additional facts [where] it is clear from the parties' briefing that those facts are both material and undisputed." *Id.*

told her that this would rule alcohol out if she didn't have any in her system. She was instructed on how to blow, but proceeded to suck on the tube twice before blowing.

(Doc. 96-1 at 8, ¶ 4.)

In support of his observations regarding Ms. Sakoc's performance on SFSTs, Trooper Carlson cites Officer Dunning's deposition testimony that "we kind of agreed that she failed the sobriety tests." (Doc. 97-9 at 17:1-17:2.) He also notes that Officer Dunning further testified that during the OLS, Ms. Sakoc raised her hand "about six inches" but "[i]t was one of the ones that's kind of close to call" and that, during the WAT, he saw Ms. Sakoc fail to touch her heels to her toes. *Id.* at 42:24-42:25. Trooper Carlson relies on Officer Dunning's opinion that: "Based on the two tests that [he] saw, . . . [Ms. Sakoc] was impaired to the slightest degree," *id.* at 14:6-14:7, and that his "opinion that night is that she was under the influence of something." *Id.* at 38:24-38:25.

Ms. Sakoc counters that the results of the HGN are not visible on the video, Officer Dunning only witnessed part of two SFSTs, and any other deficiencies in her performance are attributable to Trooper Carlson's and Officer Dunning's improper administration and scoring of SFSTs. She, however, points to no evidence that Officer Dunning fabricated his observations.

The parties also offer competing expert witness opinions regarding Ms. Sakoc's performance on SFSTs and whether SFSTs yield reliable clues regarding potential drug impairment. Ms. Sakoc's expert witness, Dr. Christopher Chapman, is a former police sergeant who holds a Master's Degree from Boston University and a doctorate degree from Northcentral University. Dr. Chapman opines that Trooper Carlson incorrectly "administered the HGN test with [Ms.] Sakoc facing oncoming traffic and the flashing lights and wig wags of his patrol vehicle." (Doc. 97-18 at 21.) Dr. Chapman further opines that Ms. Sakoc exhibited "possibly one (1) clue, that being a loss of balance while turning[,]" *id.* at 22, that she took the correct number of steps, and the video is inconclusive as to whether she touched her heels to her toes or whether she started before instructed. He opines that "the video revealed zero (0) clues" on the OLS because Ms.

10

Sakoc swayed only slightly while balancing and did not raise her hands more than six inches from her side. *Id.*

Dr. Chapman nonetheless agrees that officers may consider a suspect's performance on SFSTs; that SFSTs are "generally accepted other than the [HGN] in most courts" (Doc. 96-15 at 22:8-22:10); and that the WAT and OLS are "equally effective at predicting someone who's driving while impaired by alcohol as they are at predicting whether someone is impaired by driving under some other drugs that are central nervous system depressants[.]" *Id.* at 35:15-35:20. Dr. Chapman later qualified this response by stating that SFSTs have not been tested for "reliability" at predicting impairment. (Doc. 97-19 at 6:21.)

In support of his contention that he correctly administered and scored SFSTs, Trooper Carlson cites the testimony of his expert witness, Dr. Jack Richman, a DRE, an optometrist, and a professor emeritus at the New England College of Optometry. Dr. Richman's research focuses on, among other things, "the effect of nervous system impairment on eye movements[.]" (Doc. 96-14 at 2.) Dr. Richman opines that "[t]here were several, though slight, departures by Trooper Carlson" from the correct procedure in administering the HGN, including that "(1) the emergency strobe lights (wig-wag) on his police cruiser were not turned off facing forward and were in the suspect's line of sight, and (2) the suspect was facing oncoming traffic at night." *Id.* at 8. Dr. Richman nonetheless concludes Trooper Carlson's HGN results are "generally reliable and valid[.]" *Id.* He concedes that SFSTs have not been evaluated to measure the degree of impairment.

Trooper Carlson also cites the testimony of Sergeant James Roy, a DRE and a member of the Colchester Police Department, who opines that "Trooper Carlson properly obtained four clues on the HGN test." (Doc. 96-8 at 19.) Although Sergeant Roy was not able to view Ms. Sakoc's eyes during the HGN, he was able to view part of the administration of the HGN. Sergeant Roy acknowledges that "Trooper Carlson was not in complete compliance with his training" because he "had positioned [Ms.] Sakoc facing in the general direction of the cruiser's flashing blue lights and traffic." *Id.* Trooper

Carlson also incorrectly "paused the stimulus at the nose or center portion of [Ms.] Sakoc's face." *Id.* at 21. However, Sergeant Roy concludes that these errors "did not affect the validity of his HGN test results." *Id.*

Sergeant Roy further acknowledges that "Trooper Carlson was not in compliance with his training while explaining and demonstrating the Walk and Turn test" because he stood "with his left foot in front of his right" foot. *Id.* at 22. He nonetheless observes that Ms. Sakoc started too soon, asked a question of Trooper Carlson while turning, and turned too soon, which is sufficient to generate the two clues required for a decision point on the WAT. Sergeant Roy opines that "Trooper Carlson properly obtained two clues on the OLS test[,]" *id.* at 24, because Ms. Sakoc "sways while balancing and that she used her arm for balance." *Id.* at 25.

Finally, Trooper Carlson cites the DRE examination performed by Officer Plunkett and his subsequent deposition testimony that he reviewed the audio and video recording of the traffic stop and observed sufficient clues during Ms. Sakoc's performance on the SFSTs to support her arrest.

Ms. Sakoc's challenge to Trooper Carlson's expert witnesses is twofold. First, she argues that their scoring of her performance on SFSTs is either contrary to the video or tainted by Trooper Carlson's allegedly fabricated evidence of her erratic operation. Second, she argues that no peer reviewed studies have concluded that SFSTs are a reliable indicator of impairment by reason of a drug as opposed to alcohol and there is also no correlation between SFSTs performance and the degree of impairment. She notes that because probable cause is a question of law for the court and because post-arrest evidence is irrelevant, the evidence presented by Trooper Carlson's expert witnesses is irrelevant to a determination of probable cause.

## III. Conclusions of Law and Analysis.

### A. Standard of Review.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "draw[s] all factual inferences in favor of the

non-moving party." *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 192 (2d Cir. 2014). "There is no genuine dispute when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (internal quotation marks omitted).

"Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Spinelli*, 579 F.3d at 166-67 (internal quotation marks omitted).

In evaluating a motion for summary judgment, "a fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

## B.    Qualified Immunity.

Trooper Carlson seeks summary judgment in his favor on the grounds of qualified immunity and "bears the burden of establishing" this defense. *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

13

"The qualified immunity test is an objective one[,]" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007), therefore "'[e]vidence concerning the defendant's subjective intent is simply irrelevant to th[is] defense.'" *Jones v. Parmley*, 465 F.3d 46, 65 (2d Cir. 2006) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 (1998)). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Because qualified immunity is an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (internal quotation marks omitted).

## C.    Whether the Disputed Facts Preclude Summary Judgment.

In her § 1983 claim, Ms. Sakoc asserts that her Fourth Amendment right to be free from unreasonable seizures was violated when she was arrested without probable cause. Lack of probable cause is thus an essential element of her claim. *See Kent v. Katz*, 312 F.3d 568, 573 (2d Cir. 2002) ("A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest."). Under Vermont law, "[p]robable cause for arrest exists where the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a person of reasonable caution to believe that a crime is being committed[.]" *State v. Guzman*, 965 A.2d 544, 548 (Vt. 2008) (internal quotation marks omitted).[6]

---

[6] "'In analyzing § 1983 claims for unconstitutional false arrest, [the Second Circuit has] generally looked to the law of the state in which the arrest occurred.'" *Jaegly v. Couch*, 439 F.3d 149, 151-52 (2d Cir. 2006) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)).

14

"It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007). The parties' competing expert opinions are neither admissible nor relevant to this determination. *See Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) (citing the "well-settled rule[] of evidence" that "whether or not probable cause to arrest exist[ed] is a legal determination that is not properly the subject of expert opinion testimony") (internal quotation marks omitted); *see also Rizzo v. Edison, Inc.*, 172 F. App'x 391, 395 (2d Cir. 2006) ("The judge is both uniquely qualified and uniquely tasked to make the legal determination of what constitutes probable cause; an expert cannot assist in this task, at the summary judgment phase or at trial.").

Because probable cause is determined by the facts known to the arresting officer at the time of the arrest, subsequently acquired evidence is also irrelevant to a probable cause determination. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."); *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (observing that when determining whether a warrantless arrest was supported by probable cause, a "court must consider only those facts available to the officer at the time of the arrest and immediately before it") (internal quotation marks and brackets omitted); *see also Henry v. United States*, 361 U.S. 98, 103 (1959) ("An arrest is not justified by what [a] subsequent [investigation] discloses[.]"); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 253 (E.D.N.Y. 2000) ("It is . . . axiomatic that subsequently discovered evidence cannot be used to cure an arrest that was made without probable cause.").

Although the foregoing principles dispose of many of the disputes between the parties, there remain disputed facts relevant to a probable cause determination. As the video does not depict Ms. Sakoc's operation of a motor vehicle, a finder of fact must rely upon the parties' testimony in determining whether it was erratic. Trooper Carlson argues that his willingness to remove this fact from a probable cause determination

15

renders this issue moot. Ms. Sakoc, however, points out that evidence that Trooper
Carlson allegedly fabricated evidence of erratic operation affects the credibility of his
remaining observations during the traffic stop and renders that credibility determination a
question for the jury. The court agrees. *See Illinois v. Gates*, 462 U.S. 213, 232, 238
(1983) (explaining that "probable cause is a fluid concept" and often requires
consideration of "the 'veracity' and 'basis of knowledge' of persons supplying . . .
information").

After Trooper Carlson stopped Ms. Sakoc's vehicle, there are additional disputed
issues of fact regarding whether Ms. Sakoc's speech was slurred and whether she gave
Trooper Carlson an expired license and an invalid registration. The video and audio
recording do not clearly reflect what occurred at the inception of the traffic stop. As a
result, a determination of what transpired during that time period depends, at least to
some extent, on the parties' competing versions of those events. "Credibility
assessments, choices between conflicting versions of the events, and the weighing of
evidence are matters for the jury, not for the court on a motion for summary judgment."
*Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).

When the facts establishing probable cause are disputed, the court must submit to
the jury "only the question as to the existence of those facts" together "with instructions
as to what facts will amount to probable cause if proved[.]" *Walczyk*, 496 F.3d at 157
(quoting *Dir. Gen. of R.Rs. v. Kastenbaum*, 263 U.S. 25, 28 (1923) and *Sanders v.
Palmer*, 55 F. 217, 220 (2d Cir. 1983)). The question of probable cause thus becomes a
mixed question of law and fact which cannot be resolved on summary judgment. *Id.*
Trooper Carlson's motion for summary judgment seeking judgment as a matter of law in
his favor because there was no violation of Ms. Sakoc's constitutional rights must
therefore be DENIED.

Trooper Carlson's qualified immunity defense, however, does not depend on his
credibility if officers of reasonable competence could differ as to the existence of
probable cause even if Ms. Sakoc's version of the events is fully credited. *See Lennon v.
Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (noting that when "the factual record is not in

16

serious dispute . . .[,] [t]he ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide") (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)); *see also Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993) ("There is no material fact issue . . . when reasonable minds cannot differ as to the import of the evidence before the court."). "Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; arguable probable cause will suffice to confer qualified immunity for the arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). Accordingly, the presence of disputed issues of fact does not preclude qualified immunity in the circumstances of this case. *See Liberty Lobby, Inc.*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

### D.    Whether Trooper Carlson Had Arguable Probable Cause.

To prevail on his defense of qualified immunity, Trooper Carlson bears the burden of establishing that he had arguable probable cause to arrest Ms. Sakoc for driving under the influence of a drug. *See Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (internal quotation marks omitted).[7]

At the time of the traffic stop, Vermont law provided that: "A person shall not operate, attempt to operate, or be in actual physical control of any vehicle on a highway . . . when the person is under the influence of any other drug or under the

---

[7] "'Arguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.*

combined influence of alcohol and any other drug[.]" 23 V.S.A. § 1201(a)(3).[8]  The Vermont Supreme Court has not addressed what constitutes probable cause to arrest a suspect for operating a motor vehicle under the influence of a drug or whether performance on SFSTs provides reliable indicia regarding whether a suspect is under the influence of a drug.

Courts in other jurisdictions have found an array of indicia, including performance on SFSTs, relevant to a determination of probable cause for driving under the influence of a drug.[9]  Vermont trial court decisions have agreed that DRE evidence, which includes certain SFSTs, is admissible in the prosecution of a charge for driving under the influence of a drug.[10]

---

[8] In 2014, the Vermont Legislature amended the statute to provide that "under the influence of a drug" means "that a person's ability to operate a motor vehicle safely is diminished or impaired to the slightest degree." 23 V.S.A. § 1201(h).

[9] *See, e.g.*, *Reiver v. District of Columbia*, 925 F. Supp.2d 1, 8-9 (D.D.C. 2013) (observing that "[t]here can be little doubt that the circumstances leading to the arrest warranted a reasonable belief that plaintiff had been operating a vehicle while under the influence of intoxicating liquor, a drug, or some combination of the two" because plaintiff was driving at night in the rain without headlights, drove for six blocks before pulling over, had "erratic eye movements, . . . failed to walk in a straight line, and . . . disobeyed the officer's instructions" and concluding that "two failed sobriety tests were strong evidence of impairment"); *Castaneda v. State*, 664 S.E.2d 803, 807 (Ga. Ct. App. 2008) (finding probable cause of drug impairment where defendant was driving erratically, was "stumbling, [had] slurred speech, confusion, and difficulty balancing"); *Wilson v. Dir. of Revenue*, 35 S.W.3d 923, 926 (Mo. Ct. App. 2001) (concluding that probable cause of "intoxication or drugged condition" was established by officers' "testi[mony] that [the defendant] was 'lethargic,' that his eyes were 'watery and bloodshot,' and that he performed 'very poor' on two of three field sobriety tests. They also stated that [the defendant's] balance was 'unsteady' and 'wobbly' and that he had difficulty following instructions"); *State v. Despain*, 2007 UT App. 367, ¶ 17, 173 P.3d 213, 218 (holding "that [the officer] had probable cause to arrest Defendant for driving under the influence of drugs where he observed Defendant's slurred speech, received witness reports of Defendant's dangerous and erratic driving just prior to the collision, and observed that Defendant had collided with a trailer parked on the side of the road."); *cf. State v. Kaleohano*, 56 P.3d 138, 145-46 (Haw. 2002) (holding "that red and glassy eyes, a criminal record, and imperfect driving, standing alone, are insufficient to establish probable cause to arrest a person for driving under the influence of drugs").

[10] *See State v. Parker*, 31-5-11 Gicr, slip op. *3 (Vt. Super. Ct. Sept. 12, 2012) ("Based upon a preponderance of [the] evidence[,] the Court finds that the HGN results that the State intends to introduce at trial are admissible.  When properly administered the HGN results indicate

Courts have also observed that "[w]hen a driver exhibits a significant level of impairment and alcohol usage has been tentatively eliminated as the cause of the impairment, it is reasonable to conclude the driver is under the influence of drugs or another substance." *State v. Berger*, 2004 ND 151, ¶ 19, 683 N.W.2d 897, 903; *see also Babers v. City of Tallassee, Ala.*, 152 F. Supp. 2d 1298, 1311 (M.D. Ala. 2001) ("A reasonable officer by knowing that Plaintiff was physically impaired as illustrated by her erratic driving and deficient performance on two field sobriety tests, and that Plaintiff was not under the influence of alcohol, could have believed that a controlled substance caused Plaintiff's impairment."); *People v. Munsey*, 95 Cal. Rptr. 811, 815 (Cal. Ct. App. 1971) (observing "[t]he probability that defendant's condition was produced by alcohol having been tentatively eliminated, it became reasonable to entertain and hold a strong suspicion that defendant was under the influence of a narcotic").

The law governing driving under the influence of a drug was therefore undeveloped in Vermont at the time of Ms. Sakoc's arrest and it was evolving elsewhere. As a result, there was no accepted standard by which probable cause or arguable probable cause could be determined. Compounding the absence of guidance from the law was the lack of consensus regarding whether a suspect's performance on SFSTs performance is a reliable indicator of impairment by reason of a drug.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 131 S. Ct. at 2083 (internal quotation marks and alterations omitted). The Supreme

---

impairment by alcohol or other drugs, including central nervous depressants."); *State v. Dukette-Betit*, 161-2-10 Wmcr, slip op. *3 (Vt. Super. Ct. July 9, 2010) ("[T]his Court holds that DRE testing, if properly performed, is based upon reliable methods and principles and that V.R.E. 702 does not prohibit its admission [i]n this case."); *State v. Pearo*, 1226-10-09 Fncr, slip op. *6 (Vt. Super Ct. Jan. 4, 2010) ("[T]he Court . . holds that DRE testimony is scientific in nature and if properly performed, meets the *Daubert* standard."); *State v. Lowe*, 372-8-09 Ancr, slip op. *5 (Vt. Super. Ct. Nov. 24, 2009) ("[T]his court holds that DRE testing, if properly performed is the product of reliable principles and methods.") (internal quotation marks omitted).

Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

In contrast, where the applicable law fails to provide such guidance, courts have recognized that qualified immunity is appropriate. *See Garcia*, 779 F.3d at 96 (internal citation and quotation marks omitted) (holding qualified immunity is available where "the officers [are] confronted with ambiguities of fact and law" because "no clearly established law would make it clear to a reasonable officer that it would be unlawful to arrest [the] individuals") (internal quotation marks omitted). Qualified immunity is also available if an officer "reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Here, the undeveloped state of governing law and the lack of consensus on the reliability of SFSTs as indicia of drug impairment support granting Trooper Carlson qualified immunity.

In addition to the state of the applicable law, Trooper Carlson points to certain undisputed facts which he claims support a finding of at least arguable probable cause. He notes that Ms. Sakoc concedes that her performance on SFSTs was not perfect, the video confirms that her performance was not flawless, and it is evident from the video that she failed to follow some of his instructions and exhibited some degree of confusion. Under Vermont law, these facts are relevant to a determination of probable cause. *See State v. Mara*, 2009 VT 96A, ¶ 10, 186 Vt. 389, 987 A.2d 939 ("Although defendant did not 'fail' the tests, his performance was not flawless, and the officer need not evaluate the test results in a binary fashion. Rather, the officer must interpret the test results based on his training and experience in light of the totality of the circumstances, and some discretion inheres in that interpretation.") (citation omitted); *see also Fersner v. Prince George's Cnty., MD*, 138 F. Supp. 2d 685, 691 (D. Md.), *aff'd*, 22 F. App'x 314 (4th Cir. 2001) (finding a "reasonable law enforcement officer could have concluded (as did [the officer]) that probable cause existed based on the aborted investigation of [the plaintiff's] physical and mental condition after the single field sobriety test").

Although Ms. Sakoc contends that Trooper Carlson was not entitled to rely on SFSTs until peer reviewed studies supported their reliability in detecting drug

20

impairment, qualified immunity "is a forgiving standard[,]" and Trooper Carlson was not
required to await an unspecified degree of scientific certainty before he employed this
investigative technique. *See Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir.
2013) (observing "that qualified immunity is a forgiving standard . . . [and] that probable
cause is a fluid one that does not demand hard certainties or mechanistic inquiries")
(internal quotation marks omitted). With the exception of the HGN,[11] courts have
generally admitted SFST evidence provided by police officers as evidence of alcohol
impairment.[12] The competing expert opinions in this case reveal that reasonable law
enforcement officers could differ regarding whether SFSTs performance is equally
relevant to a determination of whether there is probable cause to believe a suspect is
under the influence of a drug. "'[I]f officers of reasonable competence could disagree' as

---

[11] Expert testimony is generally required to admit the results of an HGN exercise. *See State v.
Wilt*, 2014 VT 114, ¶ 9 (noting "both parties acknowledge[d] that the trooper was unqualified to
offer such a quantitative assessment" of an HGN evaluation); *see also People v. McKown*, 875
N.E.2d 1029, 1036 (Ill. 2007) ("[T]he results of an HGN test are meaningless to an average
person unless accompanied by expert testimony about what those results mean and what
conclusion may be drawn from them. This expert testimony comes from police officers, who
must be trained to administer and interpret the HGN test. Because the results of an HGN test
require expert interpretation, we join the majority of courts and hold that the results of HGN
testing are scientific evidence."); *State v. Helms*, 504 S.E.2d 293, 294 (N.C. 1998) ("A majority
of those jurisdictions addressing the admissibility of HGN evidence, however, have concluded
the HGN test is a scientific test requiring a proper foundation to be admissible.").

[12] *See, e.g.*, *United States v. Debenedictis*, 2010 WL 934010, at *3 (D. Guam Mar. 8, 2010)
("Because psychomotor field sobriety tests are considered non-scientific or non-technical in
nature, a description of the test and a defendant's performance on the test may generally be
admitted into evidence as lay opinion testimony under Rule 701, without the need for expert
testimony.") (internal quotation marks omitted); *Whitehead v. Book*, 641 F. Supp. 2d 549, 560-61
(M.D. La. 2008) ("Federal courts have also held that an officer trained and qualified to perform
standard field sobriety tests may testify with respect to his or her observations of a defendant's
performance of those tests if such tests were properly administered, and such observations are
admissible as circumstantial evidence that a defendant was driving while intoxicated (DWI) or
driving under the influence of alcohol (DUI)."); *see also* Doc. 97-7 at 108 (noting the National
Highway Traffic Safety Administration contracted "with the Southern California Research
Institute (SCRI) to determine [which] roadside field sobriety tests were the most accurate." The
SCRI determined "that three of these tests, when administered in a standardized manner, were a
highly accurate and reliable battery of tests for distinguishing [Blood Alcohol Concentrations]
above 0.10.").

to whether probable cause existed, 'immunity should be recognized.'" *Zellner*, 494 F.3d at 367 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As further evidence of arguable probable cause, Trooper Carlson cites the opinion of Officer Dunning, who observed some of the SFSTs, and who advised Trooper Carlson during the traffic stop that "from where [he] was standing Ms. Sakoc failed [them]." (Ex. 97-8 at 23:33:25.) Courts have recognized that a second law enforcement officer's opinion that a suspect has yielded the requisite number of clues on SFSTs supports a conclusion that qualified immunity applies. *See Corcoran v. Higgins*, 2010 WL 1957231, at *4 (S.D.N.Y. May 13, 2010) (holding a trooper was entitled to qualified immunity where "[a] second police trooper . . . was present when [the defendant] administered the walk and turn test, the one leg stand test, and the Romberg balance test, and he agreed with [the defendant] that [the plaintiff's] performance signaled that she was impaired by drugs or alcohol").

Finally, Trooper Carlson need not *prove* that Ms. Sakoc "failed" SFSTs or that SFSTs are reliable indicators of impairment by reason of a drug in order for qualified immunity to apply. An officer may be protected by qualified immunity even where the officer makes a reasonable mistake of law or fact, or both. *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1249 (2012) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments.") (internal quotation marks omitted); *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011) (holding "qualified immunity protects government officials when they make reasonable mistakes about the legality of their actions and applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact") (citations and internal quotation marks omitted).

Examining the undisputed facts in the light most favorable to Ms. Sakoc and fully crediting her version of the disputed facts, it remains true that officers of reasonable competence could differ as to whether there was probable cause to arrest Ms. Sakoc for driving under the influence of a drug in violation of 13 V.S.A. § 1201(a)(3). At the time of Ms. Sakoc's arrest, the law governing driving under the influence of a drug was

undeveloped in Vermont, the reliability of SFSTs to determine drug impairment was uncertain, and Trooper Carlson was in receipt of a second opinion from another law enforcement officer that Ms. Sakoc "failed" SFSTs and was exhibiting some degree of impairment that was not attributable to alcohol. The video further reveals that Ms. Sakoc did not follow all of Trooper Carlson's instructions and exhibited some degree of confusion and opposition that a police officer could reasonably interpret as evidence of impairment. Trooper Carlson may have been mistaken regarding both the law and the facts, but Ms. Sakoc's arrest did not violate "clearly established law" such that a reasonable police officer would have known it was unlawful. Summary judgment in Trooper Carlson's favor on the issue of qualified immunity is therefore warranted.

## CONCLUSION

For the reasons stated above, the court GRANTS Trooper Carlson's motion for summary judgment (Doc. 95) on the basis of qualified immunity.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _8th_ day of May, 2015.

Christina Reiss, Chief Judge
United States District Court